IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,517

In the Matter of KURT L. JAMES,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed October 20, 2017. One-year suspension, stayed pending successful completion of a three-year period of probation.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *Kurt L. James*, respondent, argued the cause pro se.

PER CURIAM:  This is an uncontested original proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Kurt L. James, of Topeka, an attorney admitted to the practice of law in Kansas in 1996.

On August 12, 2016, the office of the Disciplinary Administrator filed a formal complaint against respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC); an amended formal complaint was filed on December 9, 2016. After the panel granted respondent's motion for additional time to file an answer, respondent filed his answer on September 12, 2016. Respondent filed a proposed plan of probation on November 14, 2016, and an amended proposed plan of probation on November 17, 2016. An answer to the amended formal complaint was filed December 14, 2016. The parties filed written stipulations on February 8, 2017. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on February 8,

1

2017, where the respondent was personally present and represented by counsel. The hearing panel determined that respondent violated KRPC 1.3 (2017 Kan. S. Ct. R. 290) (diligence), 1.4(a) (2017 Kan. S. Ct. R. 291) (communication), 1.7(a)(2) (2017 Kan. S. Ct. R. 300) (conflict of interest), 1.15(a) and (b) (2017 Kan. S. Ct. R. 326) (safekeeping property), 1.16(a) (2017 Kan. S. Ct. R. 331) (declining representation), 3.2 (2017 Kan. S. Ct. R. 341) (expediting litigation), and 8.4(d) (2017 Kan. S. Ct. R. 379) (engaging in conduct prejudicial to the administration of justice).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"*DA12372*

"13.     In 2014, T.W. filed a domestic relations case, seeking a divorce from D.W. in Geary County, Kansas. D.W. provided income information on which child support was calculated. On March 12, 2015, the court entered a divorce decree and based the child support amount on the worksheet provided by D.W. At that same time, D.W. was undergoing treatment for a medical condition. The medical condition impaired D.W.'s ability to work.

"14.     On March 18, 2015, D.W. hired the respondent to file a Chapter 13 bankruptcy action on his behalf and to file a child support modification action in his recently finalized divorce action. The respondent and D.W. entered into a fee agreement. D.W. agreed to pay a flat fee of $3,000 for the bankruptcy case. Additionally, D.W. agreed to pay the respondent $240 per hour for the child support modification action. Later, the respondent and D.W. agreed that D.W. should proceed with a Chapter 7 bankruptcy. As a result, the respondent agreed to reduce his fee to $1,500 plus filing fees. The fee agreement, however, was not amended to reflect this change.

2

"15.      On March 18, 2015, D.W. paid the respondent $500 cash and assigned his income tax refund of $1,359 to the respondent. The respondent received that tax refund on April 21, 2015, and credited D.W.'s bankruptcy account billing.

"16.      On March 27, 2015, D.W. contacted the respondent by electronic mail to make arrangements to wire transfer funds to the respondent. D.W. informed the respondent that he would be wiring $1,941 to his IOLTA account, D.W. informed the respondent how he arrived at that figure, and D.W. confirmed the IOLTA bank account number. On March 30, 2015, Bank of America wired $1,941 to the respondent's IOLTA account for D.W. The respondent's IOLTA account records show the transfer was received.

"17.      On March 27, 2015, the respondent entered his appearance and filed a motion to modify on behalf of D.W. in the domestic relations case in Geary County. The respondent alleged a material change of circumstances in that D.W. had taken leave from work, D.W. had filed for disability benefits, D.W.'s gross income had been reduced by over $1,000 per month, and D.W. was under a doctor's care for a number of medical conditions.

"18.      The respondent submitted a child support worksheet with the motion to modify, but did not file a domestic relations affidavit.

"19.      On April 14, 2015, the Geary County District Court Trustee, Greg Kieffer, filed a response to the motion to modify child support. In the response, Mr. Kieffer noted that the child support obligation in the divorce decree filed on March 12, 2015, was based upon the child support worksheet proposed by D.W., that a domestic relations affidavit had not been filed with the motion to modify, and that a notice of change in financial circumstances had not been given to the other parent, as required by the Kansas Child Support Guidelines.

"20.      After receiving a copy of the response, D.W. asked the respondent about the last two issues raised by Mr. Kieffer. The respondent informed D.W. that he would correct the problem by filing a domestic relations affidavit. The respondent never filed a domestic relations affidavit.

3

"21.     On April 20, 2015, Mr. Kieffer served a request for production of documents seeking medical records for the past 3 years in addition to other documents. D.W. complained to the respondent that Mr. Kieffer's request for medical records from the past 3 years was unreasonable, excessive, and time consuming. D.W. asked the respondent if he could just provide medical records from the past year. The respondent directed D.W. to:

'get copies of what documents you have or what documents are in the possession of your agents, such as lawyers, accountants or others. If you do not have a document, tell [sic] you do not have to [sic] document in your possession or in the possession of an agent as described above. And get in ASAP You only have thirty days total.'

"22.     On April 30, 2015, the respondent filed D.W.'s chapter 7 bankruptcy case.

"23.     D.W. continued to be concerned about the statement made by Mr. Kieffer that the respondent had not provided notice to the other parent of the change in financial circumstances. On May 14, 2015, and on May 15, 2015, D.W. sent electronic mail messages to the respondent to determine whether the respondent had resolved the issues raised by Mr. Kieffer. D.W. informed him that he could obtain medical records for the past 2 years, as they had been gathered for his disability case. D.W. asked the respondent to find out whether Mr. Kieffer would be satisfied with medical records for the past 2 years.

"24.     On May 16, 2015, the respondent replied to D.W. and informed D.W. that he had provided notice to the other parent by providing her counsel with a copy of the motion. After receiving the respondent's reply, D.W. wrote to the respondent again, reiterating his request that the respondent ask Mr. Kieffer whether medical records for the past 2 years would be sufficient. Rather than agreeing to ask Mr. Kieffer if he would accept medical records for the past 2 years, the respondent replied to D.W. and told him that as soon as D.W. provided the discovery requests, he would file an objection regarding the medical records.

4

"25.    On May 17, 2015, D.W. sent an electronic mail message to Mr. Kieffer directly. D.W. asked Mr. Kieffer if he could bring him the requested documents and asked Mr. Kieffer if the respondent had now notified the other parent of the change in financial circumstances.

"26.    On May 20, 2015, the respondent sent an electronic mail message to D.W. asking him to immediately provide the discovery responses.

"27.    On May 22, 2015, D.W. completed the post-filing debtor education course required for the bankruptcy case and forwarded a copy of the certification to the respondent by electronic mail.

"28.    On June 1, 2015, D.W. sent the respondent an electronic mail message asking about the child support modification. D.W. made it clear that he was losing money he did not have the longer the process took. On June 2, 2015, the respondent told D.W. that he would schedule a hearing on the child support modification motion quickly.

"29.    After not hearing back from the respondent with a hearing date, on June 8, 2015, D.W. wrote to the respondent again, asking for an update. The respondent again did not contact D.W. with a hearing date.

"30.    On June 12, 2015, D.W. wrote to the respondent again, asking for an update. On June 15, 2015, the respondent called D.W. and provided D.W. with an update regarding the case.

"31.    On June 16, 2015, the respondent sent two billing statements to D.W., one regarding the bankruptcy case and one regarding the domestic relations matter. After receiving the invoices, D.W. wrote to the respondent pointing out an accounting error in the billing statements. The respondent's billing statements did not show a credit for the $1,941 wire transfer. D.W. asked the respondent to correct the billing statements and to notify him of the correct balance.

"32.	On June 22, 2015, Mr. Kieffer wrote to the respondent, reminding the respondent that he had not responded to the April request for production of documents and inquiring whether the respondent intended to abandon the motion to modify. Mr. Kieffer told the respondent that if he did not respond to the discovery requests, Mr. Kieffer would file appropriate motions to compel discovery. On June 23, 2015, the respondent replied to Mr. Kieffer, thanking him for the reminder and promising to send the discovery that day. Despite the respondent's statement to Mr. Kieffer, he did not have the discovery responses to send to Mr. Kieffer that day. The respondent did not forward the electronic mail message to D.W. and did not respond to Mr. Kieffer's discovery request.

"33.	On July 1, 2015, Mr. Kieffer wrote to the respondent and, again, reminded the respondent that he had not forwarded responses to the discovery requests. Additionally, Mr. Kieffer asked the respondent for other information regarding the change in financial circumstances alleged in the motion. Finally, Mr. Kieffer stated:

> 'Kurt, I realize this may not be the most glamorous or most lucrative case you have. But you filed a motion to modify child support in this case when the ink wasn't even dry yet on the original order. So far, you have not provided a DRA or any documentation to show a change of circumstances or to provide new numbers for a child support worksheet.'

The respondent did not reply to Mr. Kieffer's electronic mail message. Additionally, the respondent did not provide Mr. Kieffer's message to D.W.

"34.	On July 1, 2015, D.W. wrote to the respondent asking for an update on the motion to modify, the bankruptcy case, and the billing error. D.W. asked the respondent to reply within 72 hours and include a time when D.W. could call the respondent to discuss these matters. The respondent did not reply to D.W.'s email message.

"35.	On July 8, 2015, D.W. wrote to the respondent with a question about selling his home. D.W. asked the respondent for a response as soon as possible. The respondent did not respond to D.W.'s message.

"36.    On July 9, 2015, D.W. wrote to the respondent with a question about a creditor who was contacting him. Again, the respondent did not respond to D.W.'s message.

"37.    On July 14, 2015, D.W. wrote to the respondent and informed him that he would be calling at 11 a.m. that day. D.W. asked the respondent to reply if that was not a good time to call. The respondent did not respond to D.W.'s message. D.W. called the respondent at 11 a.m. and was told that the respondent could not come to the telephone because he was swamped. The respondent's assistant asked D.W. for a telephone number where he could be reached. D.W. provided the respondent's assistant with a telephone number. The respondent did not call D.W.

"38.    On that same day, the respondent sent billing statements to D.W. by electronic mail. The billing statements, again, did not show credit for the wire transfer. D.W. immediately wrote to the respondent, 'WE NEED TO TALK ASAP, WHEN IS A GOOD TIME AND DATE FOR ME TO CALL YOU?' The respondent did not reply to D.W.'s message nor did the respondent call D.W.

"39.    On July 17, 2015, D.W. sent the respondent a letter terminating the representation. D.W. informed the respondent that he would be retaining new counsel. D.W. told the respondent that he was terminating the representation because of the billing issues and the lack of communication. D.W. stated 'that in over six weeks you have basically had no contact with me in any manner.' D.W. directed the respondent to send him all of his files by July 31, 2015, so he could provide them to his new attorney. Finally, D.W. asked for a full refund of the $3,800 paid to the respondent. The United States Postal Service delivered the letter to the respondent on July 20, 2015.

"40.    On July 21, 2015, D.W. filed a complaint with the disciplinary administrator's office. On July 27, 2015, the disciplinary administrator forwarded a copy of the complaint to the respondent.

"41.    Also on July 27, 2015, D.W. forwarded a copy of his certificate of completion of the Post-Filing Debtor Education courses to the bankruptcy court. The

7

certificate was overdue and the respondent had failed to forward it to the court. In D.W.'s letter to the court, he informed the court that the respondent had abandoned his case and that future correspondence to be sent to D.W. directly.

"42.     The respondent did not send D.W. his client files or a refund by July 31, 2015, as directed by D.W. Thereafter, on August 5, 2015, D.W. sent the respondent an email message:

'Update?

'Are you alive?

'Are we going to settle things up between the two of us or am I going to have to continue to go to outside sources to tell you to either FINISH my case or REFUND me my money or something . . . .

'Ghez, come on. Man-up.'

"43.     The following day, without responding to D.W.'s email message, the respondent sent D.W. electronic invoices on both cases. The respondent continued to fail to credit the wire transfer to either account. D.W. responded:

'So, you can send bills to me . . . but you can not [*sic*] return calls or emails or advance my case or credit my account with the Van Guard [*sic*] wire?!

'Immediately withdrawal [*sic*] from my case and let me know when I can pick up my files.'

"44.     That same day, August 6, the respondent's assistant replied to D.W., 'Kurt says we will review the bill and make sure it is correct. Please disregard the one we sent you today we will be back in touch the first of the week.' D.W. replied, requesting to schedule phone call with the respondent, but neither the respondent nor his assistant replied.

8

"45. On August 10, 2015, the bankruptcy court entered an order of discharge in D.W.'s case.

"46. On August 21, 2015, D.W. emailed the respondent and asked, '[s]ince you are not advancing my child support modification case, why do you refuse to withdraw from the case?' Later, on August 25, 2015, the respondent replied:

'Dean: It was my impression is [*sic*] that you have terminated me. Is that true? If not, I will advance the case. Please let me know as soon as possible.'

D.W. replied:

'Why did you communicate now after several months of silence? Last I heard from your office was you were going to make my bill right and get back with me within one week. That was about three weeks ago.

'If it was your impression that I terminated you, how came [*sic*] you have never sent me my files or told me to come and pick them up? Why the months of silence suddenly broken?'

"47. On August 28, 2015, Douglas Thompson, an attorney in Chapman, Kansas, entered his appearance on behalf of D.W. in the child support modification case. Thereafter, on September 10, 2015, the respondent filed a motion to withdraw as counsel for D.W. in the child support modification case.

"48. At some point, D.W. received a disability determination from the Social Security Administration and began receiving disability benefits. An agreed order modifying child support was entered on October 29, 2015, under which D.W.'s former spouse would receive child support payments of $800 directly from the Social Security Administration.

9

"49.     In his written response to the complaint, on October 6, 2015, the respondent acknowledged receipt of the $1,941 wire transfer. Additionally, the respondent acknowledged receipt of D.W.'s $500 cash payment. The respondent however failed to acknowledge the tax refund of $1,359 he received on April 21, 2015.

"50.     On October 12, 2015, the respondent sent D.W. an invoice on the bankruptcy case that, again, did not reflect a credit for the wire transfer.

"51.     On December 4, 2015, in the course of the disciplinary investigation, the respondent sent D.W. a check in the amount of $1,941, the amount of the wire transfer, as a refund of unearned fees.

"*DA12403*

"52.     In 2006, M.B. retained the respondent to represent her in a post-divorce child support matter in Shawnee County District Court. M.B. agreed to pay the respondent on an hourly basis.

"53.     On December 31, 2014, the respondent filed a motion to modify child support on behalf of M.B. The court scheduled a hearing on the motion for March 6, 2015. At the conclusion of the hearing, the Administrative Hearing Officer modified the child support order and ordered the respondent to prepare a journal entry.

"54.     On March 10, 2015, the respondent filed a notice that he had served a copy of the proposed journal entry on the *pro se* opposing party in accordance with Supreme Court Rule 170. The respondent noted on his calendar the deadline for the opposing party to file an objection.

"55.     On April 28, 2015, M.B. emailed the respondent asking about the status of the journal entry. The respondent told M.B. that he had not yet filed it, but that he would.

"56.     Upon investigation, the respondent learned that he had accidentally sent the court's original child support worksheet from the hearing along with the proposed

10

journal entry to the *pro se* opposing party. The respondent inadvertently failed to retain a copy of the worksheet. Apparently, the respondent was unable to retrieve the only copy of the child support worksheet from the opposing party.

"57.     M.B. called the respondent's office several times during May, 2015, and early June, 2015. During those calls, M.B. rarely reached the respondent and, as a result, M.B. left voicemail messages for the respondent.

"58.     By mid-June, 2015, M.B. had grown impatient and called the Administrative Hearing Officer's chambers. She was told that the journal entry had been completed and was directed to contact Young Williams Child Support Services, the child support enforcement agency. When M.B. contacted Young Williams, she was told they were still waiting on the respondent to complete the journal entry.

"59.     On June 10, 2015, the Administrative Hearing Officer's administrative assistant, Anson Pruenda, called the respondent about the journal entry. Mr. Pruenda directed the respondent to file the journal entry by June 22, 2015.

"60.     Because the respondent no longer had the child support worksheet, on June 22, 2015, he went to the Administrative Hearing Officer's chambers and requested to listen to the audio recording of the hearing; however, he was not able to do so. The respondent filed a request for a copy of the audio recording of the motion hearing in order to re-create the worksheet.

"61.     On June 23, 2015, the Administrative Hearing Officer sent the respondent a letter, ordering him to submit an immediate written status report regarding the journal entry. The respondent failed to respond to the Administrative Hearing Officer's letter.

"62.     M.B. received a copy of the letter. After receiving a copy of the letter, M.B. called the respondent and the respondent stated that he would get the journal entry filed.

11

"63.     On July 20, 2015, M.B. called Young Williams to see if journal entry had been filed. It had not. M.B. then called the respondent's office and left a message for the respondent.

"64.     On July 21, 2015, M.B. called the respondent's office and spoke to his assistant, who indicated the respondent was working on the journal entry. M.B. asked when it would be done and was told it would be done the following day.

"65.     The following day, M.B. called again. Again, M.B. spoke to the respondent's assistant. The respondent's assistant told M.B. that the journal entry was done and it was at the Administrative Hearing Officer's chambers.

"66.     The journal entry was filed on July 27, 2015.

"67.     A few weeks prior to the filing of the journal entry, the opposing party lost his job. So, by the time the journal entry was finally filed, M.B. was unable to garnish the opposing party's wages. Thus, at that time, the respondent's delay injured M.B.

"68.     On August 3, 2015, M.B. terminated the respondent's representation by letter. M.B. directed the respondent to ship her file to M.B. at her own expense, by August 20, 2015. Because it is the respondent's practice to provide clients with copies of all documents as the case proceeds, the respondent told M.B. that because she should already have a complete copy of her file, he would copy her file at her expense.

"69.     On August 5, 2015, the respondent sent an invoice to M.B. that showed a credit balance of $683.46.

"70.     On August 13, 2015, the respondent filed a motion to withdraw as M.B.'s counsel. On August 17, 2015, M.B. filed a notice of dismissal of attorney, informing the court that she had dismissed the respondent as her counsel and would be retaining new counsel to represent her. On August 24, 2015, the court entered an order allowing the respondent's withdraw[al].

12

"71.     After M.B. determined that she did not wish to pay to have her file copied, in February, 2016, the respondent refunded the credit balance of $683.46.

"*DA12500*

"72.     On August 11, 2014, L.H. retained the respondent to represent her in a domestic case. It was L.H.'s position that she was in a common-law marriage. L.H. sought a divorce, a property settlement, and an order of child support. L.H. paid the respondent a $1,000 retainer.

"73.     On August 19, 2014, the respondent filed a petition for divorce on behalf of L.H. in Shawnee County District Court. In the verified petition, the respondent alleged that the parties were husband and wife, having been married by common law in 2011.

"74.     On September 29, 2014, an attorney entered his appearance on behalf of the opposing party. Opposing counsel filed an answer to the petition, denying the allegation that the parties were married.

"75.     The primary issue in the case was whether or not the parties were married. The case was set for a pretrial conference on January 20, 2015.

"76.     On January 15, 2015, opposing counsel filed a supplemental factual statement and a child support worksheet which demonstrated that the father's child support obligation should be $193 per month.

"77.     The following day, the respondent filed a factual statement which indicated that child support should be $629 per month. The respondent did not provide a child support worksheet with the factual statement.

"78.     That same day, the respondent issued a business record subpoena to the opposing party's employer. The respondent did not conduct any additional discovery.

"79.     At the pretrial conference, held on January 20, 2015, the court scheduled trial for March 4, 2015. The court allowed the parties to continue discovery until 10 days

13

before trial. The court ordered that supplemental factual statements, domestic relations affidavits, child support worksheets, and witness and exhibit lists be submitted 5 days before trial.

"80.     On January 21, 2015, opposing counsel served interrogatories and requests for production of documents on the respondent. The responses were due on February 23, 2015. The respondent did not comply with the discovery requests.

"81.     On February 24, 2015, opposing counsel emailed the respondent, seeking to determine whether he needed additional time to respond to the discovery requests. The respondent did not respond to opposing counsel's email message.

"82.     On February 25, 2015, opposing counsel sent a 'golden rule' letter to the respondent by email. Opposing counsel told the respondent that he had until February 27, 2015, to comply with the discovery requests. The respondent did not provide any responses to the discovery requests.

"83.     Opposing counsel filed a witness list, an exhibit list, an amended supplemental factual statement, and a child support worksheet, 5 days before trial, as ordered by the court. According to this child support worksheet, the father's child support obligation was demonstrated to be $203 per month. The respondent did not file a witness list, an exhibit list, an updated factual statement, or a child support worksheet.

"84.     On the Friday before trial, February 27, 2015, opposing counsel filed a motion to compel, requesting that the court order the respondent to provide the requested discovery, but noted that because the trial was less than a week away, even if the respondent provided discovery that day, it would be difficult to use in preparation for the hearing. As a result, opposing counsel requested additional sanctions, including attorney's fees incurred by his client in attempting to obtain discovery from the respondent. Opposing counsel also requested that the court order that certain pleadings be struck. Finally, opposing counsel requested that the court prohibit the respondent and his client from contesting certain facts.

"85.     At the start of the trial on March 4, 2015, the court took up the motion to compel. Opposing counsel argued that although the respondent had not provided the discovery responses, they were prepared to proceed to trial. Opposing counsel objected to any evidence being presented on behalf of the respondent's client because of the failure to provide the required documents. Opposing counsel also asked for approximately $2,000 in attorney's fees. The respondent objected to the claim for fees. Opposing counsel suggested a recess so the parties could try to negotiate a settlement.

"86.     L.H.'s bargaining position was severely compromised by the respondent's failure to respond to discovery or comply with the court's orders.

"87.     The parties reached an agreement. The respondent agreed to file an amended petition, converting the case to paternity action and thereby dismiss the claim of common-law marriage. The parties also reached agreements regarding custody, residency, and parenting time. Finally, the parties agreed that the opposing party would pay L.H. $200 in monthly child support.

"*Conclusions of Law*

"88.     Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.7, KRPC 1.15, KRPC 1.16, KRPC 3.2, KRPC 8.4(d), as detailed below.

"KRPC 1.3

"89.     Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The respondent failed to diligently and promptly represent D.W., M.B., and L.H. Regarding D.W., the respondent failed to submit a domestic relations affidavit. The respondent failed to timely prepare and file the journal entry on behalf of M.B., in accordance with Rule 170. The respondent did not prepare the journal entry until after M.B. complained. Further, the respondent failed to provide a status report on behalf of M.B. as ordered by the Administrative Hearing Officer. The respondent failed to file a child support worksheet at the time he filed the initial factual statement for L.H. The respondent failed to respond to discovery, the

15

'golden rule' letter, and the motion to compel. Then, prior to trial, the respondent failed to file an exhibit list, a witness list, an updated factual statement, and a child support worksheet, as ordered by the court. Because the respondent repeatedly failed to act with reasonable diligence and promptness in representing his clients, the hearing panel concludes that the respondent repeatedly violated KRPC 1.3.

## "KRPC 1.4

"90.    KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' In this case, the respondent violated KRPC 1.4(a) when he repeatedly failed to respond to D.W.'s urgent inquiries. For example, the respondent failed to respond to D.W.'s inquiries regarding the sale of the marital home and contact initiated by a creditor. The respondent failed to forward communications received from Mr. Kieffer to D.W. In addition, the respondent failed to adequately communicate with M.B. regarding the status of the journal entry. Because of the respondent's failure to properly communicate with his clients, both D.W. and M.B. had to obtain information about their cases from sources other than their lawyer, the respondent. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.4(a).

## "KRPC 1.7

"91.    KRPC 1.7 provides:

'(a)    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

(2)    there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former

16

client or a third person or by a personal interest of the lawyer.

'(b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)     the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)     the representation is not prohibited by law;

(3)     the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4)     each affected client gives informed consent, confirmed in writing.'

In this case, the respondent's extreme lack of diligence in representing L.H. led to a conflict of interest. The respondent failed to conduct discovery, the respondent failed to file the documents required by the court, and the respondent failed to respond to discovery. Based on the respondent's failures, opposing counsel was seeking $2,000 in attorney fees. As a result, at the time of trial, there was a substantial risk that the representation of L.H. would be materially limited by a personal interest of the respondent in avoiding a $2,000 sanction. Because the provisions of KRPC 1.7(a) apply in this case, the respondent was required to comply with KRPC 1.7(b). The respondent failed to take the steps required by KRPC 1.7(b). As such, the hearing panel concludes that the respondent violated KRPC 1.7(a)(2).

17

"KRPC 1.15

"92.     Lawyers must properly safeguard and account for their clients' property. KRPC 1.15, provides in pertinent part, as follows:

'(a)     . . . Complete records of such account funds and other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

'(b)     . . . Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer . . . shall promptly render a full accounting regarding such property.'

In this case, there is no evidence that the respondent failed to properly safeguard D.W.'s funds. The respondent's violation of KRPC 1.15 arises for his failure to maintain accurate records and properly and timely account to D.W. for the funds D.W. had paid. The respondent repeatedly sent D.W. bills which did not acknowledge the $1,941 payment. Then, during the disciplinary investigation, the respondent failed to properly acknowledge the $1,359 payment which came in the form of an income tax refund. The hearing panel concludes that the respondent's inability to determine the accurate amount paid by D.W. amounts to a violation of KRPC 1.15(a) and (b).

"KRPC 1.16

"93.     KRPC 1.16 governs the termination of a lawyer by a client. Specifically, KRPC 1.16(a)(3) requires an attorney to withdraw if the attorney's representation has been terminated. D.W. directed the respondent to withdraw from the representation on July 17, 2015. After terminating the respondent's representation, D.W. asked the respondent why he did not act on the termination; D.W. asked the respondent why he did not return file materials to D.W. so that he could retain another attorney. It was not until September 10, 2015, that the respondent finally filed a motion to withdraw from the representation of D.W. The hearing panel concludes that the respondent violated KRPC 1.16(a).

18

"KRPC 3.2

"94.     An attorney violates KRPC 3.2 if he fails to make reasonable efforts to expedite litigation consistent with the interests of his client. *Id*. The respondent caused unnecessary delay in all three cases. In his representation of D.W., the respondent failed to timely file the certificate of completion of the education course with the bankruptcy court. In addition, in representing D.W., he failed to file a domestic relations affidavit to support the motion to modify child support. The respondent caused unreasonable delay in M.B.'s case when he took no steps to complete the journal entry for an extended period of time. Then, the respondent waited until the deadline set by the Administrative Hearing Officer to attempt to complete the journal entry. Finally, with regard to L.H., the respondent caused unreasonable delay when he failed to provide a child support worksheet when he filed the initial factual statement. Later, the respondent caused additional delay by failing to comply with discovery. Opposing counsel repeatedly reminded the respondent to provide discovery responses, opposing counsel sent a 'golden rule' letter, and opposing counsel filed a motion to compel discovery. It is impossible to say how differently the case could have gone for L.H. had the respondent timely met his obligations as her attorney. Accordingly, the hearing panel concludes that the respondent violated KRPC 3.2.

"KRPC 8.4(d)

"95.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he wasted court resources and caused unnecessary delay in representing L.H. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"96.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors

19

to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"97.    *Duty Violated*. The respondent violated his duty to his clients to provide diligent representation and adequate communication. The respondent also violated his duty to his client to refrain from engaging in a conflict of interest. Finally, the respondent violated his duty to the legal system to expedite litigation.

"98.    *Mental State*. The respondent negligently and knowingly violated his duties.

"99.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual serious injury to his clients.

"100.    *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

'a.    Prior Disciplinary Offenses. The respondent has been previously disciplined in three cases. In DA10700 and DA10755, the respondent participated in the attorney diversion program for having violated KRPC 1.3 (diligence) and KRPC 1.4 (communication). The respondent successfully completed the diversion and following the period of diversion, those cases were dismissed. On December 13, 2012, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.3 and KRPC 3.2.

'b.    A Pattern of Misconduct. The respondent engaged in patterns of misconduct. First, over the course of the past 10 years, considering the three prior cases as well as the three instant cases, the respondent has violated rules regarding diligence, communication, and failure to expedite litigation regarding six different clients.

20

'c.      Multiple Offenses. The respondent committed multiple rule violations. The respondent violated KRPC 1.3, KRPC 1.4, KRPC 1.7, KRPC 1.15, KRPC 1.16, KRPC 3.2, KRPC 8.4(d). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

'd.      Vulnerability of Victim. D.W., M.B., and L.H. were all vulnerable to the respondent's misconduct.

'e.      Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1996. At the time of the misconduct, the respondent has been practicing law for nearly 20 years.'

"101.      Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

'a.      Absence of a Dishonest or Selfish Motive. A minority of the hearing panel concludes that the respondent's misconduct does not appear to have been motivated by dishonesty or selfishness.

'b.      Personal or Emotional Problems. During the period of time the respondent was representing L.H., the respondent suffered personal problems – his father was in declining health and he passed away.

'c.      Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct. The respondent refunded $1,941 to D.W. and the respondent returned M.B.'s unearned fees.

'd.      The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free

21

Acknowledgment of the Transgressions. The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the underlying facts and the rule violations.

'e.        Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney. The respondent is an active and productive member of the bar of Topeka, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.'

"102.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32     Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'4.33     Reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client.

'4.42     Suspension is generally appropriate when . . . (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

'6.23     Reprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.

22

'7.2   Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"103.   The disciplinary administrator recommended that the respondent be suspended for a period of 1 year. The disciplinary administrator further recommended that the suspension be stayed and that the respondent be placed on probation subject to the terms and conditions of probation as proposed by the respondent in his amended proposed probation plan. The respondent also recommended that he be placed on probation, subject to the terms and conditions of probation proposed in the amended proposed probation plan.

"104.   When probation is requested by a respondent, a hearing panel is required, by rule, to consider certain factors:

'(3)   The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)      the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)     the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

23

(iii)     the misconduct can be corrected by probation; and

(iv)     placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.' Kan. Sup. Ct. R. 211(g).

"105.    In considering the factors detailed in Kan. Sup. Ct. R. 211(g)(3), the hearing panel first turns to whether the respondent developed a workable, substantial, and detailed plan of probation and provided a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel at least 14 days prior to the hearing on the formal complaint. The hearing panel has carefully reviewed the respondent's timely plan of probation and amended plan of probation. The plans appear to be workable, substantial, and detailed.

"106.    Next, the hearing panel must consider whether the respondent put the proposed plan of probation into effect prior to the hearing on the formal complaint by complying with each of the terms and conditions of the probation plan. The respondent provided sufficient evidence to establish that he has put the amended plan of probation into effect by complying with all the terms and conditions.

"107.    Whether the misconduct can be corrected by probation, turns on the nature of the misconduct. In this case, the misconduct can be corrected by probation.

"108.    The last factor to consider in determining whether the respondent is eligible for consideration of probation is deciding whether placing the respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas. After carefully considering the facts of this case, it appears to the hearing panel that it is in the best interests of the legal profession and the citizens of the State of Kansas to recommend that the respondent be placed on probation, subject to the terms and conditions detailed in the respondent's amended plan of probation, as modified below.

24

"109.    The respondent engaged in a pattern of misconduct over a period of years, including many repeated rule violations in numerous cases. Based upon the respondent's serious misconduct, the hearing panel rejects the period of probation proposed by the parties. In its place, the hearing panel recommends a longer period of probation. Thus based upon the findings of fact, conclusions of law, and ABA standards, the hearing panel unanimously recommends that the respondent be suspended for a period of 2 years. The hearing panel further recommends that the order of suspension be stayed and that the respondent be placed on probation for a period of 3 years, subject to the terms and conditions listed below. The hearing panel is hopeful that with an extended period of probation, the respondent will achieve a genuine and permanent change of practice which will, hopefully, result in the prevention of future misconduct.

'1.    *Inventory of Cases and Clients.* The respondent shall maintain a written inventory of all engagements by client's name. The respondent shall update the inventory on a daily basis. The inventory shall include the client's name, the client's contact information, the client's goal, the tasks that remain to be completed, all pending deadlines, and the forum (if any) in which the matter is pending.

'2.    *Practice Supervision.* Mark Neis shall serve as the respondent's practice supervisor. The practice supervisor shall be acting as an officer and an agent of the court while supervising the probation and monitoring the respondent's legal practice. The practice supervisor shall be afforded all immunities granted by Kan. Sup. Ct. R. 223 during the course of supervising the respondent's probation. The respondent shall allow the practice supervisor access to his client files, calendar, and trust account records. The respondent shall comply with any requests made by the practice supervisor.

'3.    *Audits.* Within 30 days of the date of this report, the practice supervisor shall conduct an initial audit of the respondent's files. Thereafter, every 6 months, the practice supervisor shall conduct additional audits. If the practice supervisor discovers any violations of the Kansas Rules of Professional Conduct, the practice supervisor shall

25

include such information in the audit reports. The practice supervisor shall provide the disciplinary administrator and the respondent with a copy of each audit report. The respondent shall follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic audit reports.

'4.     *Meetings.* During the first 18 months of probation, the respondent shall meet with the practice supervisor on a weekly basis. For the final 18 months of probation, the respondent shall meet with the practice supervisor on a monthly basis, unless in the practice supervisor's opinion, the meetings should occur more frequently. The respondent shall provide the practice supervisor with an updated copy of the written inventory during each meeting. During the meetings, the respondent shall discuss a plan of action on each case with the practice supervisor. The respondent and the practice supervisor shall review the respondent's schedule for the upcoming week (or later, month) to determine that notices have been sent to all clients and other appropriate parties, that the respondent is adequately prepared, that the respondent is in compliance with all requirements of probation, and that all files have been properly updated.

'5.     *Monthly Reports.* The practice supervisor shall provide monthly reports to the disciplinary administrator regarding the respondent's compliance with the terms and conditions of probation.

'6.     *Office Procedures.* On February 22, 2017, the respondent submitted written office procedures. Within 10 days of this report, the respondent shall provide the practice supervisor with a copy of the written office procedures. If, at any time during the period of probation, the practice supervisor recommends changes or additions to the written office procedures, the respondent shall immediately implement the changes. The practice supervisor shall detail the changes or additions recommended to the respondent in his monthly report to the disciplinary administrator. The respondent shall follow the written office procedures.

26

'7.     *Client Communication*. The respondent shall respond to telephone calls, email messages, and letters within 2 business days of receipt of the client contact. The respondent shall provide a copy of documents to clients within 5 business days of receipt. On a quarterly basis, the respondent shall provide each client a detailed status report of the representation.

'8.     *Pleadings*. The respondent shall prepare all pleadings, including journal entries and motion responses within 5 business days.

'9.     *Continued Cooperation*. The respondent shall continue to cooperate with the disciplinary administrator. If the disciplinary administrator requests any additional information, the respondent shall timely provide such information.

'10.     *Additional Violations*. The respondent shall not violate the terms of his probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the respondent violates any of the terms of probation or any of the provisions of the Kansas Rules of Professional Conduct at any time during the probationary period, the respondent shall immediately report such violation to the practice supervisor and the Disciplinary Administrator, as required by Kan. Sup. Ct. R. 211(g). The Disciplinary Administrator shall take immediate action directing the respondent to show cause why the probation should not be revoked.

'11.     *Costs*. Should the Supreme Court order that the respondent pay the costs of the action as recommended by the hearing panel, the respondent shall pay the costs timely and provide proof of payment to his practice supervisor. The practice supervisor shall include that information in his monthly report.'

"110.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer. Respondent was also given adequate notice of the hearing before the panel and the hearing before this court. He filed no exceptions to the hearing panel's final hearing report. With no exceptions before us, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2017 Kan. S. Ct. R. 255). Furthermore, the evidence before the hearing panel establishes the charged misconduct in violation of KRPC 1.3 (2017 Kan. S. Ct. R. 290) (diligence), 1.4(a) (2017 Kan. S. Ct. R. 291) (communication), 1.7(a)(2) (2017 Kan. S. Ct. R. 300) (conflict of interest), 1.15(a) and (b) (2017 Kan. S. Ct. R. 326) (safekeeping property), 1.16(a) (2017 Kan. S. Ct. R. 331) (declining representation), 3.2 (2017 Kan. S. Ct. R. 341) (expediting litigation), and 8.4(d) (2017 Kan. S. Ct. R. 379) (engaging in conduct prejudicial to the administration of justice) by clear and convincing evidence and supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the panel hearing, at which the respondent appeared, the office of the Disciplinary Administrator recommended a suspension from the practice of law for a

period of one year, that the suspension be stayed, and that respondent be placed on probation subject to the terms of his proposed probation plan. The hearing panel recommended a suspension from the practice of law for a period of two years, that the suspension be stayed, and that respondent be placed on probation for a period of three years subject to the terms and conditions listed in the final hearing report, ¶ 109, items 1-11.

At the hearing before this court, the office of the Disciplinary Administrator recommended a suspension from the practice of law for a period of one year, that the suspension be stayed, and that respondent be placed on probation subject to the terms of his proposed probation plan. Respondent joined in this recommendation. After serious weighing of the panel's recommendation, the violations, and respondent's response to the complaints, including the steps he has taken to assure no future violations occur, we adopt the recommendations of the office of the Disciplinary Administrator.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED, in accordance with Supreme Court Rule 203(a)(2), (5) (2017 Kan. S. Ct. R. 234), that Kurt L. James be and is hereby disciplined by a one-year suspension from the practice of law, with imposition of the suspension stayed pending successful completion of a three-year period of probation during which respondent must comply with the terms set out by the hearing panel in the final hearing report, ¶ 109, items 1-11. This order becomes effective on the filing of this decision.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.

ROSEN, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

---